IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 17, 2025 Session

## WILL P. COTTEN v. ELIZABETH AUSTIN COTTEN

**Appeal from the Chancery Court for Williamson County**
**No. 20CV-49582J   Deanna B. Johnson, Judge**
_____

### No. M2023-01282-COA-R3-CV
_____

A mother appeals the trial court's entry of a parenting plan that designates her and her former spouse joint primary residential parents and grants them equal residential parenting time. Because the parties did not agree to be joint primary residential parents, we modify the parenting plan to name the mother primary residential parent. Otherwise, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and JEFFREY USMAN, JJ., joined.

Cynthia A. Cheatham, Nashville, Tennessee, and Travis Hawkins, Chattanooga, Tennessee, for the appellant, Elizabeth Austin Cotten.

Dana C. McLendon III, Franklin, Tennessee, for the appellee, Will P. Cotten.

## OPINION

### I.

### A.

In 2020, Will Cotten ("Father") filed for an absolute divorce from Elizabeth Cotten ("Mother"), his wife of approximately ten years. Mother filed a counterpetition. The court granted Mother a divorce on stipulated grounds, reserving the remaining divorce issues for a final hearing.

On appeal, neither party challenges the trial court's ruling on financial or property issues. The primary dispute here, as in the trial court, centers on Father's parenting time with the parties' minor children, who were three and nearly one when the divorce was filed.

Shortly after the divorce filing, Mother became convinced that Father was hiding information. She searched a laptop computer Father left at the marital residence. There, she discovered an audio recording from within her vehicle and an empty folder titled "[Mother's initials] Upskirt." After reviewing the laptop's internet browser history, Mother saw what appeared to be references to pornography, involving the word "teen." Although she never viewed the referenced websites, she suspected Father of viewing pornography, including pornography involving minors.

Father moved for entry of a temporary parenting plan. Over Mother's strident opposition, the court set a temporary parenting schedule requiring the parties to exchange the children every two days. At the hearing, Mother asserted that Father had a serious drinking problem. She also accused him of verbal and mental abuse as well as stalking, including the installation of "hidden cameras in the home, recorders in her car, and tracking on her phone." Father denied these accusations. To allay Mother's fears, the court prohibited both parents from consuming alcohol during their parenting time.

Later, at Mother's request, the court appointed a child development expert to make recommendations regarding coparenting. After several meetings with the parties and their son, the expert recommended "that parenting time should be equally divided." She found that both parents were "invested in their children's well-being" and "perceived by the children as safe." But there were also "dramatic discrepancies" and "polarization in [Mother's and Father's] views" of events that "necessitate[d] the support of a third party."

After entry of the temporary plan, Mother took Father's laptop to an information technology company for forensic analysis and retrieval of deleted files. According to Mother, the analysis uncovered nude and "upskirt" images of her and her sister as well as images depicting child pornography. Mother reported her findings to the police and the Department of Children's Services ("DCS"), who apparently investigated but took no further action.

Additionally, Mother filed an "emergency motion" asking the court to immediately suspend Father's parenting time or to order that his parenting time be supervised by a neutral third party pending a full hearing. The court denied Mother's request for immediate relief.

Within hours, Mother petitioned for an order of protection based primarily on the same allegations. According to the petition, Father had "physically, verbally, and emotionally abused" Mother throughout the marriage, including via extensive "stalking and wiretapping." His emotional abuse included "cussing directly at [her], cussing about

2

[her], name calling, yelling, screaming, unpredictable rage outbursts, violent words and actions, [and] threatening body language." His physical abuse included instances of kicking a chair in which Mother was sitting, throwing objects "across the room," dropping a casserole dish on the stove, blocking access to a hallway, picking Mother up, and slamming doors. Despite her previous testimony that Father had caused "no harm to [the children] physically," Mother asserted a concern that he spanked their son "excessively." Based on the information recently discovered on Father's laptop, Mother was "terrified" that Father was "currently stalking [the] children and [her], . . . taking inappropriate pictures of [the] children or [her], or . . . recording [them]."

The court issued a temporary ex parte order of protection preventing Father from contact with Mother or the children. With Father's consent, the court set an evidentiary hearing approximately 10 weeks later. At the hearing, Mother questioned her computer expert extensively about the laptop's internet browser history. She elicited testimony that the expert "interpret[ed]" certain URLs containing the word "search" as indicative that someone had actively searched for certain terms on pornographic websites. But the expert cautioned that there "wasn't much to glean" from most of the URLs. Due to time constraints, only the direct examination of Mother's expert was completed that day. Pending a final ruling, the court granted Father four professionally supervised hours of parenting time each week.

B.

For various reasons, it was nearly a month before the order of protection hearing resumed. In the meantime, the court held a hearing on Father's temporary parenting time.

Mother hypothesized that Father could "be taking inappropriate pictures of [their] children and potentially sharing those with people." She testified that she once found a black recording device in a pile of laundry in the parties' master bathroom. She presented "upskirt" videos of her and her twin sister in their homes and on vacation as well as other videos of Mother taken without her knowledge or permission. Additionally, she submitted images she alleged to be pornography depicting "small children."

Mother reported new concerns about "bruises and marks on the children." She had taken dozens of photographs of the children beginning "days after [Father] filed for divorce" and continuing until his parenting time was suspended. She started noticing spots on the children, which she described as "thumb mark" like, in some of the photos.

For his part, Father asserted his Fifth Amendment right against self-incrimination in response to questions about secret recordings of Mother or her sister. But he adamantly denied abusing his own children or Mother. And he had "never in [his] life" seen child pornography.

3

The neutral parenting supervisor reported that she "didn't see anything concerning" in Father's interactions with the children. The children "were very happy to see their father" and "were very comfortable with him."

At the end of the hearing, the court ordered the parties to resume the equal parenting schedule in the temporary plan with supervision of Father's parenting time. It allowed Father's parents to supervise going forward rather than a third party.

C.

Before resuming the hearing on the order of protection, the court held a hearing on Mother's earlier motion to restrict Father's parenting time based on the information gleaned from his laptop. To expedite the proceedings, the court directed the parties' computer experts to exchange information and draft a joint report explaining the items to which they agreed and disagreed.

Neither computer expert saw any "evidence that anyone using th[e] computer searched for illegal and/or underage pornography . . . nor was any illegal or underage pornography found." The experts agreed that the laptop had been used to view images on several "commercial pornography websites," but these websites were "known . . . not to display child pornography." According to both experts, commercial pornography websites often used the words "teen" and "girl" as descriptors "to describe adults" between ages 18 and 25.

Father's expert, a former law enforcement investigator, viewed the websites and verified that they did not depict child pornography. Nor was he concerned about the occasional appearance of the parties' children in the videos of Mother and her sister as the children "were not a point of focus."

Mother rejected the expert testimony. In her view, child pornography was "in the eye of the beholder," and she believed that the evidence showed that Father used child pornography. Though she admittedly had no evidence or knowledge that Father had sexually abused either of their children, she asked the court to "take into consideration" her concern "that [Father] may be doing this same activity to [their] children . . . and that [their] children are in danger." According to her, since Father had resumed exercising parenting time, both children were having accidents, "wak[ing] up at night" and calling for Mother, becoming "more aggressive in hitting," and saying "shut up." She believed this could be a sign of sexual abuse. Neither Father nor the paternal grandmother had observed such dramatic shifts in behavior during Father's parenting time.

Mother's clinical psychologist expressed concern about Father's repeated invocation of his Fifth Amendment privilege. He saw no evidence that the children were

4

the target of "anything sinister." Still, he recommended supervised visitation "unless there [was] an explanation about" the voyeuristic videos.

In the end, the court found "no evidence that the children have been affected by these videos and pictures or by the pornography websites." So it reinstated the original temporary plan without supervision.

D.

Nearly a month later, the court completed the order of protection hearing. Only Mother testified. According to her, Father had stalked her before filing for divorce by making the audio recordings in her car, taking the upskirt images, and attempting to log on to several of her online accounts. She feared that there were "secret recording devices in [her] home," her car, or even public restrooms. As for physical violence, Mother testified that shortly before the divorce, Father had entered their shower "uninvited" and "attempt[ed]" to kiss her. When she rebuffed his advances, he "slammed" the door and "stormed downstairs." Mother worried that Father's behavior could "escalate . . . to physically harming" her or the children.

Mother disclosed—for the first time—that, after the last hearing, her two-and-a-half-year-old daughter complained that "she didn't feel well" and "her bottom hurt." Suspecting abuse, Mother contacted DCS and had her daughter examined by a professional. Mother reported that the exam revealed no evidence of "anything from a medical standpoint that they could see that was physically wrong." But she believed that DCS "would be investigating."

Finding that Father "Abused/Threatened to Abuse," "Sexually Assaulted," and "Stalked" Mother, the court granted her a one-year order of protection. But it dismissed the protective order as to the children.

E.

Mother's counterpetition for divorce included tort claims for "invasion of privacy, wiretapping, electronic surveillance, unlawful photography, negligence per se, intentional infliction of emotional distress, negligent infliction of emotional distress, assault and battery, observation without consent, and/or stalking." The court granted her requests for a jury trial on the tort claims and a jury decision on eight questions of fact related to parenting. *See* Tenn. Code Ann. § 36-4-113 (2021) (permitting the court to send disputed "matters of fact" in a divorce action to a jury).

Much of the testimony was a reprise of the previous hearings. Mother took the stance that Father's "past behavior is the best predictor of future behavior." She had no evidence that he had made voyeuristic media of anyone other than her or her sister. And

she had no images taken later than the year before the divorce filing. She had no evidence that he had used a tracking device. Nor did she have evidence to support her speculation that he may have recorded her or anyone else with a bathroom camera, shared voyeuristic media with others, or possessed some as-yet-undiscovered illegal pornography. As she had throughout previous hearings, she repeated her claim that Father used child pornography and was a danger to their children.

For his part, Father finally addressed the allegations that he secretly recorded "upskirt" videos of Mother and her sister. He admitted to creating voyeuristic media of Mother and her sister during a three-year period toward the end of the marriage. And he "put a recording device in [Mother's] car a handful of times" during the marriage. He planted the audio recording device in her vehicle and planned to hide a camera in her home office because he believed that Mother was having an affair. He claimed he "stopped doing it" after finding no such evidence.

Father described his "despicable" behavior as a misguided reaction to Mother's strict views on marital intimacy. In lieu of an affair, Father turned to pornography and created voyeuristic media of Mother and her twin sister for personal use. He denied searching for or viewing any child pornography. He insisted he used his cell phone for the recordings and did not intentionally place a camera in the bathroom. Acknowledging that he faced pending criminal charges in Florida and Tennessee for his voyeuristic conduct, Father avowed that it would "never happen again."

The jury returned a verdict for Mother on her tort claims of invasion of privacy, intentional infliction of emotional distress, and unlawful photography. But it found her other tort claims unsupported by the evidence. As for the fact questions, the jury found no evidence that Father had abused the children, Mother, or any other person.

F.

Approximately six weeks later, the court convened a final hearing on custody and parenting time. The court considered additional testimony from Mother and Father as well as the testimony of several professionals: a forensic psychologist, a clinical psychologist, the son's therapist, and a court-appointed parenting expert.

At the court's direction, Father had submitted to a psychosexual evaluation. The forensic psychiatrist diagnosed Father with "voyeuristic disorder," but found no significant signs of "pedophilia, . . . a substance abuse problem, or any other psychiatric illness." His assessment "showed that [Father] has a sexual interest in adult women only." His opinion of Father's internet search history corresponded with that of the computer experts. Like them, he understood "teen" to be a "common search term" used to refer to younger adult performers. He believed that Father's chance of voyeuristic recidivism was relatively low.

6

Both the forensic psychiatrist and the clinical psychologist expressed concern that the children were present when Father secretly recorded Mother and her sister. This was, in their professional opinions, "abusive behavior." They believed there was a potential risk, however small, that a video showing glimpses of the children could be disseminated at some point. They warned that, if Father continued this activity, the children could become aware of it and, at some point, suffer emotional or psychological harm. Even so, they did not identify a present risk of harm to the children posed by unsupervised time with Father.

Both expert witnesses recommended that Father's parenting time be supervised "until [he] has engaged in treatment and that treatment provider feels comfortable that the children are or can be safe with [Father] unsupervised." The court-appointed parenting expert agreed that supervision was a good idea, but she was "not convinced that a backwards shift [would] make the most sense."

Not for the first time, Mother revealed a previously undisclosed incident of possible abuse. According to her, three days before the hearing, her son indicated that he had been touched inappropriately at school. The following day, Mother took the son to his therapist and his pediatrician. Based on Mother's account, they both made reports to DCS. Yet even Mother recognized there were discrepancies in the son's story.

Overall, Mother remained concerned about possible child abuse. Still, she "didn't claim that" she had any evidence that Father physically or sexually abused his children.

G.

After considering the best interest factors, the court crafted a parenting plan that designated Mother and Father joint primary residential parents and granted them equal parenting time on a week-on, week-off basis. *See* Tenn. Code Ann. § 36-6-106(a)(1)-(15) (2017). Mother responded with motions to extend her order of protection and to alter or amend the judgment to "reconsider [the] decision of equal parenting time." According to her, Father's past behavior "continue[d] to place [her] in fear of harm." She also complained that he had parked his vehicle "in close proximity" to hers during the trial. She reasserted that "equal parenting time [was] not in the children's best interests" based on the proof at trial and sought consideration of post-trial claims regarding changes in childcare expenses and the impact of travel time on the children. The court extended Mother's order of protection for another year. But it denied her request to modify the parenting schedule.

## II.

A trial court has broad discretion in fashioning parenting arrangements. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). A trial court abuses its discretion only

if it applies the wrong legal standard, reaches "an illogical or unreasonable decision," or bases its decision "on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010); *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). When reviewing a discretionary decision, we must determine: "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Lee Med., Inc.*, 312 S.W.3d at 524; *see Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 306 (Tenn. 2020).

In crafting a permanent parenting plan, the touchstone is always the best interest of the child. Tenn. Code Ann. § 36-6-106(a); *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-6-401(a) (2021)). The plan must "permit[ ] both parents to enjoy the maximum participation possible in the life of the child consistent with the [best interest] factors . . . , the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a). The parenting schedule must also, "consistent with the child's developmental level and the family's social and economic circumstances, . . . encourage each parent to maintain a loving, stable, and nurturing relationship with the child." *Id.* § 36-6-404(b) (2021). Unless certain limiting factors are dispositive, the court's decision should be based on a non-exclusive list of statutory factors in Tennessee Code Annotated § 36-6-106(a). *Id.; see also id.* § 36-6-406 (2021) (listing limiting factors).

The determination of a child's best interest presents a question of fact. *Armbrister*, 414 S.W.3d at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, we "presume that a trial court's factual findings on [best interest] are correct." *Armbrister*, 414 S.W.3d at 693. We will not overturn a trial court's best interest findings unless the evidence preponderates against them. *Id.* In weighing the preponderance of the evidence, the trial court's findings of fact based on witness credibility are given great weight, and they are not overturned "absent clear and convincing evidence to the contrary." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

A.

Mother first contends that the trial court erred in designating her and Father joint primary residential parents. Tennessee law contemplates the possibility that parents may be designated "joint primary residential parents" when their children are "scheduled to reside an equal amount of time with both parents." Tenn. Code Ann. § 36-6-410(b) (2021). But "[u]nless the parties agree on such an arrangement, a joint designation is not authorized." *Hasley v. Lott*, No. M2022-01141-COA-R3-JV, 2023 WL 4633509, at *13 (Tenn. Ct. App. July 20, 2023); Tenn. Code Ann. § 36-6-410(b) (explaining that, "[i]n the absence of an agreement between the parties, a single primary residential parent must be

designated"). Father concedes that he and Mother did not agree to joint primary residential parent status.

"Typically, we would remand this issue to the trial court to determine which parent should be the primary residential parent." *Hasley*, 2023 WL 4633509, at *13. However, Father has agreed on appeal that Mother should be named primary residential parent "in light of the trial court's determinations here about decision making." Thus, we modify the permanent parenting plan to name Mother the primary residential parent.

B.

Mother argues that the trial court erred "as a matter of law in awarding equal residential parenting time in direct contravention of Tenn[essee] Code Ann[otated] § 36-6-406(a)(2)." When this divorce action was filed, the statute provided that

> a parent's residential time . . . shall be limited if the limitation is found to be in the best interest of the minor child and if the court determines, based upon . . . reliable evidence, that a parent has engaged in . . . [p]hysical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

Tenn. Code Ann. § 36-6-406(a)(2) (2021).[1] By its plain terms, the statute required the trial court to limit Father's parenting time only if it made two findings: (1) Father abused Mother or the children; and (2) a limitation on Father's parenting time was in the children's best interest. *See Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012) (explaining that, "[w]hen the language of the statute is clear and unambiguous, courts look no farther to ascertain its meaning").

The trial court found no evidence of abuse.[2] Mother insists that this record contains a "mountain of evidence of [Father's] abuse" of her and others.[3] She points to Father's

---

[1] This version of the statute became effective on June 11, 2020. 2020 Tenn. Pub. Acts 606 (ch. 693). Mother relies on cases interpreting a previous version of the statute, which did not expressly reference the child's best interest. *See, e.g.*, *Jacobsen v. Jacobsen*, No. M2012-01845-COA-R3-CV, 2013 WL 1400618, at *1 (Tenn. Ct. App. Apr. 5, 2013) (interpreting the former version of the statute as a "mandate[ ] that a parent's parenting time shall be limited if the parent is found to have engaged in abuse"); *see also* Tenn. Code Ann. § 36-6-406(a) (2017). We apply the version of the statute in effect when Father filed this divorce action. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

[2] The court noted that the jury made the same finding. The jury found no evidence that Father abused the children or any other person. With respect to Mother specifically, the jury found no evidence that Father physically, sexually, or emotionally abused her.

[3] Mother asks us to consider post-trial evidence of Father's purported bad behavior as part of this "mountain of evidence." *See* TENN. R. APP. P. 14(a). Generally, a motion to consider post-judgment facts

voyeuristic activity, the expert testimony that committing a crime in the presence of children constitutes child abuse, and the court's findings when it granted her an order of protection. Still, even if Mother is correct on this point, a finding of abuse, standing alone, does not trigger the statutory mandate. Limitation of Father's parenting is only required if it is in the children's best interest. *See* Tenn. Code Ann. § 36-6-406(a)(2).

While we are sympathetic to Mother's desire to ensure the children's safety, the evidence does not preponderate against the court's implicit finding that limiting Father's parenting time was not in the children's best interest. *Morgan Keegan & Co., Inc. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) (holding that, "when construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated."). The court acknowledged the expert recommendations that Father's parenting time should be supervised as a precautionary measure. Yet it recognized that Father had successfully completed several months of supervised parenting time before resuming the current unsupervised schedule. And the court-appointed parenting expert did not recommend going backwards. Most importantly, there was no proof that unsupervised parenting time with Father posed a specific risk of harm to the children.

Based on our review, the court did not abuse its discretion in fashioning an equal parenting plan. The court determined that most of the relevant factors weighed equally between the parents. It found that, for the most part, Mother and Father had shared parenting responsibilities before and during the litigation.[4] *See* Tenn. Code Ann. § 36-6-106(a)(1), (2), (5), (10). Both were willing and able to provide for the children's needs. *See id.* § 36-6-106(a)(4). Each child "fel[t] secure . . . and like[d] being with each parent." *See id.* § 36-6-106(a)(6). The children's emotional ties to both parties and their extended families were strong. *See id.* § 36-6-106(a)(6), (9). Only the factor related to the parties' "moral fitness" weighed in favor of Mother. *See id.* § 36-6-106(a)(8). The court recognized that Father had "engaged in horrendous criminal conduct in taking video and still photographs of his wife and her sister." This demonstrated a severe lack of "moral fitness." *See id.* But despite Mother's concerns, "[t]here [was] no evidence either party

must be "unrelated to the merits" of the case. *Town of Dandridge v. Patterson*, 827 S.W.2d 797, 802 (Tenn. Ct. App. 1991) (citing TENN. R. APP. P. 14 advisory comm'n cmt.). Consideration typically extends "only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." TENN. R. APP. P. 14(a). Such consideration "is not intended to permit a retrial in the appellate court." *Id.* advisory comm'n cmt. We decline to exercise our discretion to consider additional "matters pertaining to subsequent litigation now pending in the trial court." *See State ex rel. SCA Chem. Waste Servs., Inc. v. Konigsberg*, 636 S.W.2d 430, 432 (Tenn. 1982). Thus, Mother's two motions to consider post-judgment facts are denied.

[4] Mother contends the court erroneously based its parenting decision on the "status quo." A court should not draw any presumptions from a temporary plan. *See* Tenn. Code Ann. § 36-6-406(e). But it may consider the terms of a long-standing temporary plan when fashioning a permanent one. *See Woody v. Woody*, No. E2020-01200-COA-R3-CV, 2022 WL 678976, at *20 (Tenn. Ct. App. Mar. 8, 2022).

has abused the children or the other party." *See id.* § 36-6-106(a)(11). Father "testified he no longer engages in this conduct[,] and there [was] no evidence to the contrary." Father was taking batterers intervention classes, seeing a certified sex addiction therapist, and attending Sexaholics Anonymous meetings.

The best interest analysis is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Our role is not to "tweak a visitation order in the hopes of achieving a more reasonable result than the trial court." *Eldridge*, 42 S.W.3d at 88. The court applied the correct law, the evidence does not preponderate against its factual findings, and its decision is within the range of acceptable alternative dispositions. *See Lee Med.*, 312 S.W.3d at 524.

## C.

Both Mother and Father seek an award of attorney's fees on appeal. Tennessee follows the well-established rule that parties are responsible for their own attorney's fees absent a statute or agreement between the parties providing otherwise. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000). Neither Mother nor Father cites any authority or makes any argument as a basis for their requests. *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) (explaining waiver of issues under Tennessee Rule of Appellate Procedure 27); *Charles v. McQueen*, 693 S.W.3d 262, 284 (Tenn. 2024) (defining the proper method for an appellee to request attorney's fees on appeal). Because Mother and Father failed to do so, we deem these issues waived.

## III.

Father has agreed to name Mother primary residential parent, and we modify the parenting plan accordingly. Otherwise, the trial court did not abuse its discretion in fashioning the permanent parenting plan. So we affirm the court's order as modified.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE

11